FILED
2013 Sep-18  PM 04:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| **SHIRLEY TINGLE,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.: 4:12-CV-8-VEH** |
| | ) |
| **CITY OF BIRMINGHAM, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

---

## MEMORANDUM OPINION AND ORDER

On January 6, 2012, the plaintiff, Shirley Tingle, filed this employment discrimination action against her employer, the City of Birmingham. (Doc. 1). The complaint also names Frank Schillaci and Veola Foy, who are also employees of the defendant, but it does not state whether they are sued individually or in some official capacity. (Doc. 1 at 3). Various fictitious defendants are also named. (Doc. 1).

The complaint alleges sexual harassment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.* (Count One); retaliation in violation of Title VII (Count Two); assault and battery (Count Three); outrage (Count Four); negligent hiring, training, and supervision (Count Five); respondeat superior (Count Six); deprivation of civil rights in violation of 42 U.S.C. § 1983 (Count Seven); and violation of the Americans with Disabilities Act of 1990

("ADA"), 42 U.S.C. §§ 12101, *et seq*. (Count Eight).

The case comes before the court on the motion for summary judgment filed by all of the defendants.  (Doc. 31).  For the reasons stated herein, the motion will be **GRANTED in part** and **DENIED in part**.

## I.    STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (internal quotation marks and citation omitted).  The party requesting summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings in answering the movant. *Id.* at 324. By its own affidavits – or by the depositions, answers to interrogatories, and admissions on file – it must

designate specific facts showing that there is a genuine issue for trial. *Id.*

The underlying substantive law identifies which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman*, 229 F.3d at 1023. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the evidence presented by the non-movant to rebut the moving party's evidence is merely colorable, or is not significantly probative, summary judgment may still be granted. *Id.* at 249.

How the movant may satisfy its initial evidentiary burden depends on whether that party bears the burden of proof on the given legal issues at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant bears the burden of proof on the given issue or issues at trial, then it can only meet its burden on summary judgment by presenting *affirmative* evidence showing the absence of a genuine issue of material fact – that is, facts that would entitle it to a directed verdict if not controverted at trial. *Id.* (citation omitted). Once the moving party makes such an affirmative showing, the burden shifts to the non-moving party to produce

"significant, probative *evidence* demonstrating the existence of a triable issue of fact." *Id.* (citation omitted) (emphasis added).

For issues on which the movant does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115-16. First, the movant may simply show that there is an absence of evidence to support the non-movant's case on the particular issue at hand. *Id.* at 1116. In such an instance, the non-movant must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* at 1116-17. When responding, the non-movant may no longer rest on mere allegations; instead, it must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996). The second method a movant in this position may use to discharge its burden is to provide affirmative *evidence* demonstrating that the non-moving party will be unable to prove its case at trial. *Fitzpatrick*, 2 F.3d at 1116. When this occurs, the non-movant must rebut by offering *evidence* sufficient to withstand a directed verdict at trial on the material fact sought to be negated. *Id.*

## II.   FACTS

### A.   The Defendants' Facts and Evidence Which Have Been Excluded

The court's summary judgment scheduling order, entered in this case on January 9, 2012, provides that "[t]he moving party shall list in separately numbered paragraphs each material fact the movant contends is true and not in genuine dispute, and upon which the moving party relies to demonstrate that it is entitled to summary judgment." (Doc. 4 at 15) (emphasis added).  In this case, the movants have listed twenty-four such facts.[1]  However, within the body of their brief, the movants also refer to additional evidence and facts not cited or included in the "facts" section of the brief.  The court's scheduling order provides: "Except for good cause shown, briefs and evidentiary materials that do not conform to [these] requirements may be stricken." (Doc. 4 at 13).  Since these additional facts and evidence were not in the initial "facts" section of the brief, they will not be considered by the court.[2]

---

[1]Many of these "facts" are not facts at all but just "allegations" from the complaint which the defendants set out in their motion as facts.  The scheduling order requires the defendants to support each fact with "a specific reference to evidentiary submissions." (Doc. 4 at 15).  However, the movants only cite to the complaint for these facts.  Still, as they are not disputed, they are deemed to be admitted.

[2]This is not the only instance where the defendants failed to follow the scheduling order's requirements.  The order "requires all documents created by counsel for submission to the court to be in 14 point type, except that footnotes may be in 12 point type." (Doc. 4 at 10).  It also "requires that all citations to legal authority include pinpoint references." (Doc. 4 at 10).   The order also states that "[a]ny motion(s) for summary judgment filed in this action **must comply** with **all** requirements of **Appendix II** of this order." (Doc. 4 at 9) (emphasis in original).  Appendix II clearly sets out other  requirements for motions for summary judgment, briefs, and

**B.    Facts Offered By the Defendants and Admitted By the Plaintiff**

The  following facts, set out exactly as they were offered by the defendants, are

not disputed by the plaintiff:[3]

1.    The Plaintiff, Shirley Tingle, hereinafter ("Tingle "or "Plaintiff"), was hired by the City of Birmingham on or about October 8, 1992 as a general laborer.

2.    The defendants are the City of Birmingham and its employees Veola Foy and Frank Schillaci ("City").

3.    The City is a municipal corporation under the laws of the State of Alabama.

4.    . . . In her deposition, Plaintiff admitted that she has suffered from mental instability, anger management issues, and has taken and continues to take medications for depression in conjunction with

---

evidence in support of and in opposition to motions for summary judgment.  (Doc. 4 at 13-20).  It also provides that **"These instructions must be followed explicitly.  Except for good cause shown, briefs and evidentiary materials that do not conform to the following requirements may be stricken."**  (Doc. 4 at 13) (emphasis in original).

On April 7, 2013, the defendants filed their brief in support of the instant motion for summary judgment.  (Doc. 31).  This document fails to comply with the court's requirements in <u>many</u> respects.  Some of these deficiencies include: the document is filed in what appears to be 10 point type instead of 14 (doc. 4 at 10, 14); many citations to legal authority do not include pinpoint citations (doc. 4 at 10); the  initial brief exceeds twenty pages but does not include a table of contents that accurately reflects its organization (doc. 4 at 14); an electronic copy of the brief was not delivered to chambers (doc. 4 at 15); and the court's courtesy copies were not three hole punched (doc. 4 at 15).  The reply brief of the defendants also is deficient.  In addition to not being in 14 point type, it completely fails to respond to the plaintiff's statement of additional facts (doc. 4 at 17-18).  Further, the initial brief is mostly devoid of analysis.  In many cases, the defendants have merely cut and pasted whole passages from case law and presented them as if they were the defendants' own words.  Facts and references to the record are few and far between.  <u>For these reasons alone, the court could deny or strike the motion.</u>

[3]Only portions of facts 4 and 20 have been disputed.  Where appropriate, the court will address those disputes in footnotes.

6

psychological counseling from the time of her initial employment with the until [sic] now. In part, testified [sic] as followst [sic]:[4]

> Q Okay. Have you ever been seen by a mental health professional like a psychiatrist or –
>
> A Yes.
>
> Q Okay.
>
> A Dr. Gibson told me the medicine she had me on, if I got -- if I felt depressed or like I wanted to hurt myself or something, she told me to go -- no. She said over the weekend, I want you to check yourself in UAB or either Brookwood and tell them that I sent you. And I said I -- I said, that's the psych ward. She said, yes, it is. She said, I need you to go there. If not, then make an appointment with this doctor here. And she gave me a Dr. Foster Freeman. He's right there by Brookwood.
>
> Q What's his name?
>
> A I think it's Freeman or Foster. I don't know. I'll have to go and get all that.
>
> Q Okay. Is he still there?
>
> A Best of my knowledge.
>
> Q How often -- is that the only mental health professional like a psychiatrist or psychologist that you've seen?

---

[4]The first sentence of this fact stated: "Since being hired, [p]laintiff has had a long and dubious history of employment with the [p]laintiff [sic] having filed multiple EEOC Charges." (Doc. 31 at 2).  The plaintiff disputes this "fact" stating that it is merely counsel's opinion, not facts in the case.  The court agrees.  The court will not include this fact for that reason, and also because it does not contain a citation to the record as required by this court's scheduling order.

A No. I -- I went to -- what you call it anger management classes, but I went because I asked to go. The City of Birmingham got a program where -- it's the same place as the anger management class. When you asked me how many times I had been --

Q Yes, ma'am.

A -- and I said I didn't know. But I asked if I could go confidential because I didn't want the directors and them to know what I was doing.

Q And you just felt like you needed to go?

A I went to talk to somebody. So I went to talk to a psychiatrist. I asked to go because they had the type of program if you feel stressed or something like that and you just need somebody to talk to. And they said the lady -- when I called the lady, she said she didn't have to -- she told me don't tell nobody what I was doing.

Q Sure.

A But if they question it, then she can answer that. I said I didn't want the directors know what I was doing.

Q When was this?

A They just knew I had an appointment. I didn't know. Different times I've gone.

Q Okay. Have you gone five times or ten times?

A Five times, ten times. You have to pull those records. She can do that too if you have to.

Q I mean, did you go three times a year? I'm just --

8

A I was going like maybe twice a week or something.

Q For how long?

A I don't know. I didn't keep up with the time. I just needed somebody to talk to. And they were all --

Q Starting --

A And they were always calling.

Q Starting in 1992 or 2000?

A Maybe two -- I'm going to say two --2000 maybe. I'm not sure. I'm not sure of the time.

Q So from --

A But I've been taking medicine all the time because --

Q Listen, I'm not trying to narrow you down to no exact time because --

A I don't know.

Q I know. I wouldn't expect you to remember that. I couldn't -- nobody could remember that, so I'm not trying to give you a hard time. But I'm just trying to get a -- a range. So you would say from 2004 maybe?

A Huh-uh. Way before then.

Q Okay. So way before the year 2000 you were going twice a week?

A Sometimes three times a week I would meet with a

9

counselor. But didn't nobody know what I was doing but the counselor and myself, which is anger management classes. But they don't call it that.

Q And this is a City of Birmingham sponsored thing?

A It's sponsored by the City of Birmingham. So what they do is they call in, what you call it? Anonymous --

Q Right.

A -- number? Nobody knew who it was calling for me. They just knew that this person called and left a message. I had to be here.  But if their personnel medical records have to pull those records, they can do that.

[(Doc. 35-1 at 57(163)-81(168))].[5]

From November 2004 Until July 2007, Ms. Tingle was cited at least 51 times with violations of her employer's policies and procedures. Even during her deposition, Ms. Tingle made statements that were beyond the bounds of what a reasonable similarly situated person of average mental capacity would say, for example:

Q Okay. Tell me about that other lawsuit.

A I don't remember exactly everything that happened. But I filed one for harassment and sex discrimination. Because at the time, there were six or however many directors they had. And I was a female, and they were – weren't trying to help me. They just took the male's word for what was going on. Nobody wasn't disciplined but me.

---

[5]The court includes this portion of the plaintiff's deposition because it was part of a fact offered by the defendants and not disputed by the plaintiff.  However, it does not appear to be relevant to the motion.

Q Okay. What were you disciplined for?

A Once -- I don't remember exactly all the details. The director, Mr. Steve Fancher --I called in, reported off from work. And Mr. Bill Allen asked me why was it reporting off. I said, I'm taking a personal day. And he said, okay. And he called me back. I hung the phone up, and he called me back. He said he had to put something -- he said, I need to put something for the reason why you're taking off. I said, I'm taking a sick day or a vacation day. So he asked me did I have any time. And I said, I should have time. He said, well, you need to know whether you've got time or not because I have to put something down. I said, well, if I don't have time; I have something on there noted I don't get paid if I take off. So I hung the phone up in his face. He called me back. He said, Mr. Fancher wants me to -- us to put something down when you call. I'm -- not when employees call, when you call off. They was already picking at me anyway for another lawsuit that I had filed. And I said, tell him I'm having sex; and I can't stop. So when I came back to work, I had -- I received a write-up that I was going to have a hearing. And I met before Mr. Fancher and some of the other male directors. And he asked me what did I say. And I told him to ask the supervisor, whatever the supervisor said. And he asked Mr. Allen what was said, and he told him what I said, that I was having sex and I couldn't stop. So Mr. Fancher said that's unacceptable. He couldn't accept that and I was going to be disciplined for that. And I said, why? Because that was personal. He shouldn't have been asking me all of those questions. I said I was taking a personal day. So they gave me some time off for it. I don't know -- I don't remember how many days it were.  Mr. Fancher hit the table, and I hit the table too. And I said, well, all I know is if -- if you're going to discipline me; you need to do something about him too. You know, I said, I don't think it's fair all y'all mens here; and then y'all keep picking at me for no reason

at all. I can't go to the bathroom. You've got the drivers calling in saying I'm – they're taking me to the bathroom. You don't do no other employees like that, you know. I filed several suits because they been harassing me since I been there from 1992 until I left.

(Doc. 35-1 at 24(32)-25(34)).[6]

5.      In September 2008, Plaintiff requested an accommodation to be near a bathroom for her claimed disability of irregular bowel syndrome. No medical records have been provided to support and substantiate this claim of irregular bowel syndrome to date.

6.      Nevertheless, Plaintiff was transferred in order to accommodate her alleged disability.

7.      Plaintiff alleges that immediately upon her transfer, she began to suffer from continuous harassment, abuse and intimidation by employees Veola Foy and Edward Tate.

8.      Plaintiff alleges that she was pushed by Veola Foy on July 2009.

9.      Plaintiff alleges that she was in continuous fear of what she describes as imminent danger from assault and by the use of offensive language by Veola Foy and Edward Tate, which she claims continued until January 16, 2010.

10.     Plaintiff alleges that she was discriminated against on the basis of age because she was 59 years of age at that time she was deprived of overtime compared to younger employees with less service time who

---

[6]Again, it is unclear why the defendants include this fact, unless they are attempting to somehow attack the plaintiff's credibility; a tactic which has no place in a motion for summary judgment. The last sentence of this fact is a sentence fragment stating: "In sum, Ms. Tingle previously filed an action against the City for calling off . . . " (Doc. 31 at 6). It is disputed and will not be included.

were given opportunities to work overtime.[7]

11.     Plaintiff alleges that she complained of the alleged discrimination to her supervisor, Mr. Leroy Cowan, specifically regarding harassment, abuse, intimidation and younger employees being assigned to work overtime.

12.     Plaintiff alleges that Veola Foy, while being questioned by Mr. Leroy Cowan, regarding Plaintiff's allegations against her, stated that she would continue with the behavior because Plaintiff is nothing but trouble.

13.     Plaintiff alleges that Edward Tate, who prepared schedules for workers at Fair Park, pushed the door of the ticket booth open and into Plaintiff, then turned the lights out on her.

14.     Plaintiff alleges that she reported the matter to Sandra Brown and Daniel Brown, but they did not give her complaints any credence.

15.     Plaintiff alleges calling Ricky Kennedy to complain but never received a return call.

16.     Plaintiff alleges that in response to her complaint dated January 8, 2010, she received a letter stating that she would be transferred effective from January 16, 2010.

17.     On January 15, 2010, Plaintiff filed a Police report against Veola Foy and Edward Tate.

18.     On January 16, 2010, Plaintiff alleges that she was assigned to ride in a truck with named Defendant Frank Schillaci and because of that the accommodation for her disability was removed. Plaintiff claims that she complained about this, the [sic] but nothing was done on the matter.

---

[7]Why the defendants include this fact is unclear, as there is no age discrimination claim in this case.

19.    Plaintiff alleges that from the date of transfer to the truck till [sic] February 23, 2010, Plaintiff suffered unwanted sexual advances from Frank Schillaci. Plaintiff claims that Frank Schillaci stated that the Plaintiff was a trouble maker and no one would believe her.

20.    Plaintiff alleges that Supervisor, Valerie Stancil witnessed, [sic] Frank Schillaci reaching out to touch Plaintiff's breast, but did not reprimand or discipline him and just asked him to not curse the Plaintiff. Plaintiff claims that Ms. Stancil witnessed the Plaintiff push Frank Schillaci's hand off her. . . . [Valerie Stancil stated that, on February 23, 2010, she] saw Plaintiff shove the Defendant and use inappropriate and sexually charged comments around the Defendant Schillaci to which he never responded.[8]

21.    Plaintiff alleges that when she narrated the whole incident to Supervisor Eric Fagan, he responded to her by explaining and justifying Frank Schillaci's behavior as that is how one needs to work.

---

[8]The plaintiff disputes the sentence "[Valerie Stancil stated that, on February 23, 2010, she] saw Plaintiff shove the Defendant and use inappropriate and sexually charged comments around the Defendant Schillaci to which he never responded." The court could choose not to include this fact because it fails to include a citation to the record as required by the court's scheduling order. (See doc. 4 at 15-16) ("Each such statement must be followed by a specific reference to those portions of the evidentiary record that the movant claims supports it."). However, the scheduling order also requires that "[a]ny statements of fact that are disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon which the dispute is based." (Doc. 4 at 16). The plaintiff fails to provide a citation as well. Stancil's affidavit is short. (Doc. 31 at 108-109). She describes the incident in question. The fact is properly included. The defendants also proffer: "However, in her sworn affidavit, Ms. Stancil states that she never saw Defendant Schillaci touch Plaintiff[.]" (Doc. 31 at 9). This fact will not be included because the court must cast the facts in the light most favorable to the plaintiff, and the defendants have admitted the following fact which was offered by the plaintiff: "Valerie Stancil witnessed Schillaci touching her breasts." (Doc. 33 at 11). Finally, the following fact from paragraph 20, proffered by the defendants, will not be included: "Stancil also states in her sworn affidavit that Plaintiff Tingle consistently engaged in inappropriate conduct and lewd language toward many male employees in her presence." (Doc. 31 at 9). Stancil's affidavit does state in a conclusory manner that "she always engaged in lewd comments to the men who worked in the department," but only describes one such incident specifically. The fact will not be included.

14

22.    Plaintiff alleges that when she refused Frank Schillaci's sexual advances, he complained against her to get her into trouble.

23.    Plaintiff alleges that after her complaint to her employer regarding Frank Schillaci's conduct, Mr. Schillaci claimed the Plaintiff hit him, and as a result, Plaintiff was terminated from employment with the City.

24.    Plaintiff alleges that she appealed against her termination, which was reversed and she instead was given fifteen (15) days suspension.

(Doc. 31 at 2-9) (citations and deposition line numbers omitted).

## C.    Facts Offered By the Plaintiff and Admitted By the Defendants

The plaintiff sets out several facts to which the defendants fail to respond.  The summary judgment scheduling order provides:

> The reply submission . . . shall consist of only the moving party's disputes, if any, with the non-moving party's additional claimed undisputed facts. . . . *All additional material facts set forth in the statement required of the opposing parties will be deemed to be admitted for summary judgment purposes unless controverted by the statement of the movant.*

(Doc. 4 at 18) (emphasis in original).  Because the defendants have not addressed them, the following facts, offered by the non-movant and set out verbatim, are deemed to be admitted:

26.[9]    As far back as the '90's Tingle was wrongfully written up for complaining about male co-workers['] inappropriate sexual remarks.

---

[9]The plaintiff begins numbering with "26."  There is no fact numbered "25" offered by any party.

15

27.   Tingle appeared before numerous hearings, and no action was taken against the men for the harassment Tingle complained of so she kept filing charges.

28.   If Tingle complained, all the employees in the field and on the truck would tell her she was a trouble maker, make jokes about her, and tell her they can't talk to her because she is writing everything down.

29.   Tingle was diagnosed with Irritable Bowel Syndrome which required her to go to the bathroom frequently.

30.   Tingle gave the doctor's notes with the diagnoses from Dr. Danika Hickman to Charles Carter in the personnel office at the City of Birmingham and to Fancher her supervisor.

31.   Tingle asked Fancher if she could work on the lot near a bathroom due to the fact she has to go frequently and he refused this request.

32.   The employees on the truck would complain because they had to stop for Tingle to go to the bathroom.

33.   After Tingle filed her lawsuit, the men would tell her they couldn't just take her to the bathroom, that they had to radio it in which was humiliating because they were not required to call other employees in.

34.   Tingle went to Cowan at Fair Park, asked if he had any openings, and told him she had irregular bowel syndrome.

35.   Cowan said he [could not] help her be transferred to Fair Park.

36.   After being refused by Fancher, Tingle went to city hall, spoke with Larry Langford, and requested him to transfer her to Fair Park.

37.   Tingle was transferred to Fair Park to accommodate her for her disability.

38.     Upon arriving at Fair Park, Tingle spoke with Cowan regarding her disability.

39.     Upon arriving at Fair Park, Tingle began to experience problems with Veola Foy and Edward Tate.

40.     Tingle reported this to Ricky Kennedy in private.

41.     Veola Foy shoved Tingle and told her to get out of the way.

42.     Tingle asked Cowan if she could be assigned to sit in the ticket booth to get away and separated from Veola Foy and he allowed her to do so.

43.     Edward Tate slammed the door to the ticket booth onto Tingle when he knew Tingle was sitting there.

44.     Veola Foy walked past the booth calling Tingle and [sic] bitch and a whore.

45.     Veola Foy further stated, "I know that bitch is in there", and "I ought to kill her ass", and told Tingle, "do what the fuck I tell you to do."

46.     When Tingle told Cowan what happened, Veola Foy admitted to calling Tingle a bitch and a whore and told him she didn't care if she was written up because she "didn't like that bitch".

47.     Foy also stated to Cowan in Tingle's presence, "I damn did this, and that is not all I will do… I will have someone knock her off after work because she is nothing but trouble."

48.     Director Kennedy would not return Tingle's calls, so Tingle filed a police report.

49.     Tingle went to the director to complain about Foy and Tate and she was transferred to ride on the truck with Frank Schillaci.

17

50.    Tingle didn't want to leave Fair Park because she was there to accommodate her disability.

51.    On January 13, 2010, before she was relocated on January 16, 2010, Tingle filed a charge with the EEOC complaining about how the transfer removed her from her accommodation.

52.    Frank Schillaci pulled on Tingle's arms trying to hug her, talked to her about having sex with her and how he could satisfy her with his tongue.

53.    Frank Schillaci told Tingle she could come to his house and park around the corner or in the garage and no one would know she was there.

54.    Frank Schillaci took his tongue and licked apple sauce stating it was how he was going to do Tingle.

55.    Frank Schillaci made frequent comments to Tingle from January 16, 2010 to February 23, 2010.

56.    Frank Schillaci reached over and touched Tingle's breast in the truck and she knocked his hand off her breast.

57.    Frank Schillaci put his hand on Tingle's knee.

58.    Tingle complained to Fagen about Schillaci touching her breasts.

59.    Valerie Stancil witnessed Schillaci touching her breasts.

60.    Fagan, a supervisor, told Tingle that she should not worry about Schillaci doing that, claiming "he just does that, you know, acts like that sometimes . . . he is used to working on the garbage truck".

61.    After this complaint, Tingle was still required to work with Schillaci and he continued to curse her.

18

62.    Schillaci showed Tingle his penis.

63.    Schillaci said no one would believe her because she is a troublemaker.

64.    Tingle was fired after her complaint and Schillaci was allowed to continue work.

65.    Tingle appealed the decision and the termination was changed to a fifteen (15) day suspension.

66.    After she was reinstated in March 2010, and after her written complaint of a removal of her accommodation, Tingle was assigned to the Georgia landfill on a bulldozer which was even further away from a bathroom.

67.    While at the landfill, Tingle would have to call someone to pick her up to go to the bathroom.

68.    On one occasion, Tingle had an accident on herself because she could not get to the bathroom in time.

69.    At the landfill, Tingle's supervisor, John Green called women "bitches" and "whores", and said if he can "fuck [them]"[10], [he will] do it.

70.    Tingle complained to Al Hickman, Mayor Bell, Adlei Trone, Chuck Forest.

71.    On June 25, 2010, Tingle filed a claim with the City of Birmingham.

72.    Tracy Murray, another employee complains [sic] of numerous gender-based remarks being made to her on a regular basis at the City

---

[10]The fact reads "him," but, in her testimony supporting this fact, the plaintiff says "them."  (Doc. 31 at 63(141)).

of Birmingham.

73.     Tracy Murray complained of sexual harassment and was retaliated against by wrongfully being written up on almost a daily basis and moved to less desirable positions.

74.     Tracy Murray's harasser was never written up for his behavior.

(Doc. 33 at 7-13) (citations omitted).

## III.   ANALYSIS

### A.   Sex-Based Title VII Discrimination Claims

#### 1.     *The Only Proper Defendant Is the City of Birmingham*

The complaint is unclear as to which defendants are sued under this claim.

However, the Eleventh Circuit Court of Appeals has stated that

> "[i]ndividual capacity suits under Title VII are ... inappropriate. The relief granted under Title VII is against the *employer,* not individual employees whose actions would constitute a violation of the Act. We think the proper method for a plaintiff to recover under Title VII is by suing the employer, either by naming the supervisory employees as agents of the employer or by naming the employer directly."

*Cross v. State of Ala., State Dep't of Mental Health & Mental Retardation*, 49 F.3d 1490, 1504 (11th Cir. 1995) (*quoting Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir.1991)) (emphasis in original).  To the extent that the complaint is seeking Title VII relief against the individual defendants, it is due to be dismissed.  The court will analyze the claim only as it applies to the City of Birmingham.

20

### 2. *Overview of the Types of Sexual Harassment*

Sex-based discrimination that alters the terms and conditions of employment is prohibited by Title VII. 42 U.S.C. § 2000e–2(a)(1).

> The forbidden alteration can be brought about in either of two ways. One is through a tangible employment action, such as a pay decrease, demotion or termination. The other way is through creation of a hostile work environment caused by sexual harassment that is sufficiently severe or pervasive to alter the terms and conditions of work.

*Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1300 (11th Cir. 2007) (internal citations omitted); *see also, Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1231 (11th Cir. 2006) ("Under the first theory, the plaintiff must prove that the harassment culminated in a 'tangible employment action' against her. Under the second or 'hostile work environment' theory, the plaintiff must prove that she suffered 'severe or pervasive conduct.'"); *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 507-08 (11th Cir. 2000) ("Generally, sexual harassment comes in two forms: harassment that does not result in a tangible employment action (traditionally referred to as 'hostile work environment' harassment), and harassment that does result in a tangible employment action (traditionally referred to as 'quid pro quo' harassment)).[11]

---

[11]Tangible employment action discrimination has, in the past, been referred to as so called "quid pro quo" discrimination. *See*, *Henson v. City of Dundee*, 682 F.2d 897, 908 (11th Cir. 1982) ("An employer may not require sexual consideration from an employee as a quid pro quo

The plaintiff claims tangible employment action harassment that resulted in her termination, which was later changed to a suspension from work.  (Doc. 1 at 9).  She also claims that she was subjected to a hostile work environment.  (Doc. 1 at 9).  The defendants attack both.  Each will be addressed in turn.

### 3.  *Tangible Employment Action Harassment*.

### a.  **To the Extent It Is Attacked at All, the Defendants Only Attack One Element of this Claim**

To establish a prima facie tangible employment action case, a plaintiff must show:

> (1) that she belongs to a protected group; (2) that she has been subject to unwelcome sexual harassment; (3) that the harassment was based on her sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment; and (5) that there is a basis for holding the employer liable.

*Bryant v. Sch. Bd. of Miami Dade Cnty.*, 142 F. App'x 382, 383 (11th Cir. 2005).[12]

---

for job benefits.").  In *Bryant v. Sch. Bd. of Miami Dade Cnty.*, 142 F. App'x 382 (11th Cir. 2005), the Eleventh Circuit noted:

> Because the Supreme Court instructed us that term should no longer be used in the analysis of whether an employer is liable under Title VII, *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 753-54, 118 S.Ct. 2257, 2265, 141 L.Ed.2d 633 (1998), we have used the preferred term "tangible employment action" to refer to harassment that culminates in a discharge, demotion, or undesirable reassignment. *See Frederick v. Sprint/United Mgmt. Co.,* 246 F.3d 1305, 1311 (11th Cir.2001).

*Bryant*, 142 F. App'x at 383.

[12]While other types of Title VII cases employ the traditional and familiar burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668

Section "I" of the plaintiff's brief is entitled: "Plaintiff Cannot Establish A *Prima Facie* Case of Sexual Harassment or Hostile Work Environment." (Doc. 31 at 12). While the title of this section implies an attack on <u>both</u> the tangible employment action and the hostile work environment claims, the defendants' argument, for the most part, addresses only whether the conduct aimed at the plaintiff was "severe or pervasive," an element of <u>only</u> a hostile work environment claim.

Still, in three sentences at the end of section "I," the defendants write:

> In this matter, the [p]laintiff cannot present evidence that the alleged sexual harassment was focused or directed towards the plaintiff because of her sex or gender. In the typical case, in order for the alleged harassment to be subject to Title VII, it must be based on the plaintiff's sex. A sexual harassment claim can be based on offensive conduct, which is not of a sexual nature but which is inflicted on an employee because of gender.

(Doc. 31 at 15). The defendants then cite, without discussion, *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999), <u>a hostile work environment case</u>. Both

---

(1973) and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Eleventh Circuit has been clear that it is "unwilling to read the *McDonnell Douglas-Burdine* framework into non-retaliation sexual harassment cases." *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 511 (11th Cir. 2000); *see also, Welch v. Jim Aartman, Inc.*, 806CV2100-T-27MSS, 2008 WL 1029407 at *6 (M.D. Fla. Apr. 9, 2008) ("The *McDonnell Douglas* burden-shifting framework does not apply to claims for sexual harassment.").

tangible employment action and hostile work environment claims have the requirement that the harassment be "based on sex." *See Bryant*, 142 F. App'x at 383 (tangible employment action claim element "that the harassment was based on her sex"); *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010) (hostile work environment element "that the harassment must have been based on the sex of the employee"). Accordingly, these three sentences <u>could</u> be an attack on the third element of the tangible employment action case.[13]

### b.    The Standard

The movants have not, and need not, submit evidence on this issue. Since the burden of proof of the elements of a tangible employment action claim is on the plaintiff, the defendants may, as they have done, simply "show [] . . .that is, point[] out to the district court-that there is an absence of evidence to support the non-moving party's case.'" *Fitzpatrick*, 2 F.3d at 1116 (*quoting United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Counties in State of Ala.*, 941 F.2d

---

[13]When viewed in the context of the defendants' entire argument this seems unlikely. For one thing, as noted, the *Mendoza* case, to which the defendants cite without discussion, is a hostile work environment case. Further, if these three sentences were addressed to the tangible employment action claim, they would be the <u>only</u> argument directed towards that claim out of this entire section of the defendants' brief. The defendants' reply brief addresses this issue in only one sentence. (Doc. 35 at 4) ("Plaintiff further produced no evidence that she was subjected to harassment based on her sex."). However, the court will give the benefit of the doubt to the defendants and assume that they are attacking the tangible employment action claim.

1428, 1438 (11th Cir. 1991)).[14]  To rebut that showing,

> the non-movant must respond in one of two ways. First, he or she may
> show that the record in fact contains supporting evidence, sufficient to
> withstand a directed verdict motion, which was "overlooked or ignored"
> by the moving party, who has thus failed to meet the initial burden of
> showing an absence of evidence. *Celotex,* 477 U.S. at 332, 106 S.Ct. at
> 2557 (Brennan, J., dissenting). Second, he or she may come forward
> with additional evidence sufficient to withstand a directed verdict
> motion at trial based on the alleged evidentiary deficiency. *See* Melissa
> L. Nelkin, *One Step Forward, Two Steps Back: Summary Judgment
> After Celotex*, 40 Hastings L.J. 53, 82-83 (1988).

*Id.* at 1116-17.  To determine whether the non-movant would survive a motion for

directed verdict, the court reviews

> "all of the evidence in the light most favorable to, and with all
> reasonable inferences drawn in favor of, the nonmoving party." When
> "substantial evidence is presented opposed to the motion, and this
> evidence is of such quality and weight that reasonable and fair-minded
> persons in the exercise of impartial judgment might reach different
> conclusions, the motion must be denied."

*German v. Broward Cnty. Sheriff's Office*, 439 F. App'x 867, 869 (11th Cir. 2011)

*cert. denied*, 132 S. Ct. 2387, 182 L. Ed. 2d 1031 (U.S. 2012) *reh'g denied*, 133 S. Ct.

77, 183 L. Ed. 2d 717 (U.S. 2012) (*quoting MacPherson v. University of Montevallo*,

922 F.2d 766, 770 (11th Cir.1991) and *University of Fla. v. KPB, Inc.*, 89 F.3d 773,

---

[14]The plaintiff misconstrues the defendants' argument and the burden on this point, arguing that the defendants have "failed to inform the district court of the basis for its motion, and [']identifying those portions of [the record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue of material fact.'"  (Doc. 33 at 21) (*citing Celotex*, 477 U.S. at 323).

775 (11th Cir.1996) respectively)); *see also, Dancey Co., Inc. v. Borg-Warner Corp.*,

799 F.2d 717, 719 (11th Cir. 1986) ("A motion for directed verdict should be granted

only when, viewing the evidence as a whole and all reasonable inferences in a light

most favorable to the nonmovant, reasonable jurors could not reach a contrary

verdict.").

    As with many sexual harassment cases, the conduct about which the plaintiff

complains comes in two forms, alleged harassing language, and physical contact with

the plaintiff.   The court will address each type in turn.

### c.    Verbal Harassment

    In *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 809-11 (11th Cir.

2010), the Eleventh Circuit wrote:

>     Although gender-specific language that imposes a change in the
> terms or conditions of employment based on sex will violate Title VII,
> general vulgarity or references to sex that are indiscriminate in nature
> will not, standing alone, generally be actionable. Title VII is not a
> "general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775,
> 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (quoting *Oncale*, 523 U.S.
> at 80, 118 S.Ct. 998). As we observed in *Baldwin v. Blue Cross/Blue
> Shield of Alabama*, "Title VII does not prohibit profanity alone, however
> profane.
>
> . . .
>
>     In particular, sexual language and discussions that truly are
> indiscriminate do not themselves establish sexual harassment under Title
> VII.  The Supreme Court has "never held that workplace harassment,

even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations." *Id.* at 80, 118 S.Ct. 998. Title VII's test instead is whether "members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* (quoting *Harris*, 510 U.S. at 25, 114 S.Ct. 367 (Ginsburg, J., concurring)).

Nevertheless, a member of a protected group cannot be forced to endure pervasive, derogatory conduct and references that are gender-specific in the workplace, just because the workplace may be otherwise rife with generally indiscriminate vulgar conduct. Title VII does not offer boorish employers a free pass to discriminate against their employees specifically on account of gender just because they have tolerated pervasive but indiscriminate profanity as well. *See Williams v. Gen. Motors Corp.*, 187 F.3d 553, 564 (6th Cir.1999) ("We do not believe that a woman who chooses to work in the male-dominated trades relinquishes her right to be free from sexual harassment.").

Equally important to our inquiry here is the common-sense rule that the context of offending words or conduct is essential to the Title VII analysis. Even gender-specific terms cannot give rise to a cognizable Title VII claim if used in a context that plainly has no reference to gender. Thus, for example, were a frustrated sales representative to shout "Son-of-a-bitch! They lost that truck," the term would bear no reference to gender. In contrast, however, when a co-worker calls a female employee a "bitch," the word is gender-derogatory. As we observed in *Baldwin*, the terms "bitch" and "slut" are "more degrading to women than to men." 480 F.3d at 1302. The original definition of the term "bitch" is "the female of the dog." Webster's Third New International Dictionary 222 (2002). The term's secondary meanings are likewise gender-specific: "a lewd or immoral woman" or "a malicious, spiteful, and domineering woman." *Id.* Calling a female colleague a "bitch" is firmly rooted in gender. It is humiliating and degrading based on sex. *Cf. Harris*, 510 U.S. at 23, 114 S.Ct. 367 (holding that, to prove a hostile work environment, courts may consider whether conduct is humiliating).

As the Supreme Court has observed, "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Oncale*, 523 U.S. at 81–82, 118 S.Ct. 998. *See also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) ("Context matters."); *EEOC v. WC&M Enters., Inc.*, 496 F.3d 393, 398–99 (5th Cir.2007) (emphasizing the importance of context for analyzing claims under Title VII). Thus, we proceed with "[c]ommon sense, and an appropriate sensitivity to social context," to distinguish between general office vulgarity and the "conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." *Oncale*, 523 U.S. at 82, 118 S.Ct. 998.

A final principle that guides us in this decision is that words and conduct that are sufficiently gender-specific and either severe or pervasive may state a claim of a hostile work environment, even if the words are not directed specifically at the plaintiff. *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331–32 (4th Cir.2003) (en banc) (concluding that Title VII may be violated even when the plaintiff is not individually targeted). *See also Petrosino v. Bell Atlantic*, 385 F.3d 210, 221 (2d Cir.2004). It is enough to hear co-workers on a daily basis refer to female colleagues as "bitches," "whores" and "cunts," to understand that they view women negatively, and in a humiliating or degrading way. The harasser need not close the circle with reference to the plaintiff specifically: "and you are a 'bitch,' too." *See Yuknis v. First Student, Inc.*, 481 F.3d 552, 553–54 (7th Cir.2007) (observing that comments need not be directed specifically at a person to be discriminatory; comments addressed to the plaintiff's "target area"—that is, her protected group—may constitute actionable harassment). Similarly, words or conduct with sexual content that disparately expose members of one sex to disadvantageous terms or conditions of employment also may support a claim under Title VII. *See Petrosino*, 385 F.3d at 222 ("[T]he depiction of women in the offensive jokes and graphics was uniformly sexually demeaning and communicated the message that women as a group were available for sexual exploitation by men.").

28

*Reeves*, 594 F.3d 798, 809-11 (11th Cir. 2010).

The defendants have not disputed that Foy called the plaintiff a "bitch" and a "whore" and that Tingle's supervisor, John Green, called women "bitches" and "whores."[15]   These comments are actionable.  *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 813 (11th Cir. 2010) ("It is undeniable that the terms "bitch" and "whore" have gender-specific meanings," and "belittle[] women.").  Further, the following comments are clearly of a sexual nature:  Green commenting, in reference to women, that if he can "fuck them," he would do it; Schillaci talking to the plaintiff about having sex, specifically oral sex, with her; and Schillaci telling Tingle she could come to his house and park around the corner or in the garage and no one would know she was there.[16]  The failure to dispute these comments is sufficient to survive a motion for directed verdict on the issue of whether the plaintiff endured

---

[15]The court notes that it is undisputed that "[a]s back as the '90's [sic] Tingle was wrongfully written up for complaining about male co-workers inappropriate sexual remarks." (Doc. 33 at 7).  This fact focuses on the "write ups" and not the comments themselves.  The court does not view this fact as setting out an additional example of harassing words used towards or around the plaintiff, as it does not explain the words used, the context, the speaker, etc.

[16]While this last comment is the only one which is not, on its face, blatantly sexual or gender specific, in her deposition the plaintiff mentioned this comment in response to being asked about other sexually charged statements made by Schillaci.  (Doc. 31 at 75(190)).  A jury could reasonably conclude that Schillaci was discussing how he and the plaintiff could rendezvous at his home for sex.

comments based on sex.[17]

### d.    Physical Harassment

The defendants also have not disputed the following actions:

– Schillaci pulling on Tingle's arms trying to hug her;

– Schillaci simulating oral sex with an apple sauce container, while telling Tingle that he would perform a similar act on her;

– Schillaci reaching over and touching Tingle's breast;

– Schillaci putting his hand on Tingle's knee; and

– Schillaci showing Tingle his penis.

These actions are all sexual in nature.[18]    This undisputed conduct is sufficient

_____

[17]The court is aware that the "constellation of surrounding circumstances, expectations, and relationships . . . are not fully captured by a simple recitation of the words used or the physical acts performed," *Oncale*, 523 U.S. at 81–82, 118 S.Ct. 998.  However, even though the plaintiff's response discusses these acts in detail (see doc. 33 at 16-18), neither the defendants' initial brief, nor their reply brief, discusses any of these comments or the acts discussed in the next section.  The defendants do not explain how any of this conduct, which all clearly appears to be sexual, or gender derogatory in nature, might not be based upon sex.  "There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."  *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).   The defendants do argue in one sentence that "it has to be considered whether it any [sic] such conduct ever happened to Ms. Tingle in light of her employment history, her perceived mental instability, and her coworkers universal opinion of the same." (Doc. 31 at 13).  This appears to be an argument that the plaintiff lacks credibility.  That argument fails as "[i]t is well established that '[c]redibility determinations are the exclusive province of the jury.'"  *United States v. Calderon*, 127 F.3d 1314, 1325 (11th Cir. 1997) *holding modified by United States v. Toler*, 144 F.3d 1423 (11th Cir. 1998) (*quoting United States v. Parrado*, 911 F.2d 1567, 1571 (11th Cir.1990), *cert. denied*, 498 U.S. 1104, 111 S.Ct. 1005, 112 L.Ed.2d 1088 (1991)).

[18]As with Schillaci's comments about meeting the plaintiff at his home, "hugging" and touching the plaintiff's knee are not necessarily sexual acts.  However, in the context of the other

evidence to survive a motion for directed verdict.

The motion will be denied as to the tangible employment action claim.

### 4.   *Hostile Work Environment Claim*

To prove a hostile work environment, the plaintiff must show

> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

*Reeves*, 594 F.3d at 808 (internal citations omitted).  The defendants attack the third

and fourth elements of the hostile work environment prima facie case.

### a.   **Whether the Conduct Was Based On Sex**

The attack on the third element fails for the same reasons as it did on the

tangible employment action claim.

---

undisputed conduct of Schillaci, and resolving all inferences in favor of the plaintiff, the court concludes that there is a genuine issue of material fact as to whether the conduct was sexual. *See, e.g., Bryars v. Kirby's Spectrum Collision, Inc.*, CIV.A. 08-283-KD-B, 2009 WL 1286006 at *12 (S.D. Ala. May 7, 2009) (viewing hugs as sexual when viewed in context of other conduct).

### b.   Whether the Harassment Was Sufficiently Severe and Pervasive to Alter the Terms or Conditions of Employment

As to the fourth element, the Eleventh Circuit has stated:

> Establishing that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and an objective component. *Harris,* 510 U.S. at 21–22, 114 S.Ct. 367. The employee must "subjectively perceive" the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable. *Id.* The environment must be one that "a reasonable person would find hostile or abusive" and that "the victim ... subjectively perceive[s] ... to be abusive." *Id.* at 21, 114 S.Ct. 367.

*Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999);  *see also, Guthrie v. Waffle House, Inc.*, 460 F. App'x 803, 806 (11th Cir. 2012) (discussing subjective and objective components).  As they did with the tangible employment action claim, the defendants argue again that the plaintiff cannot present evidence "that the alleged harassment was sufficiently severe or pervasive to alter the terms and conditions of employment."  (Doc. 31 at 12-13).  Accordingly, the same burden applies to the plaintiff here.

Based upon the undisputed conduct in this case, and the multiple complaints by the plaintiff, a jury could determine that the plaintiff subjectively perceived, and a reasonable person objectively would perceive, that the conduct in this case was sufficiently severe or pervasive so as to alter the terms and conditions of the

plaintiff's employment.  The hostile work environment claims survive.

### B.    __The Retaliation Claims__

Again, because only the City of Birmingham is the only proper defendant under Title VII, the retaliation claims will be dismissed to the extent that they are made against the individual defendants.  *See, Cross*, 49 F.3d at 1504.  The court will analyze the retaliation claims as they apply to the City.

The Eleventh has set out the analytical framwork for retaliation claims as follows:

> "To establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there is some causal relation between the two events." *Olmsted v. Taco Bell Corp.,* 141 F.3d 1457, 1460 (11th Cir.1998) (citing *Meeks v. Computer Associates Int'l,* 15 F.3d 1013, 1021 (11th Cir.1994)). The causal link element is construed broadly so that " 'a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.' " *Olmsted,* 141 F.3d at 1460 (quoting *E.E.O.C. v. Reichhold Chem., Inc.,* 988 F.2d 1564, 1571-72 (11th Cir.1993)). Once a plaintiff has established a prima facie case, the employer then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action. *Olmsted,* 141 F.3d at 1460; *Meeks,* 15 F.3d at 1021. The ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct remains on the plaintiff. *Olmsted,* 141 F.3d at 1460.

*Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).

The defendants do not state what alleged act of retaliation they attack.  They

33

merely cite the law on retaliation and then state: "All of the evidence in the case, including the [p]laintiff's own statement made soon after <u>the incident of alleged harassment she claims</u>, indicate that she was the aggressor and physically assaulted the [d]efendant Frank Schillaci."  (Doc. 31 at 17) (emphasis added).  No further information or facts are provided.[19]

Strangely, in her brief, instead of providing evidence to refute the claim that she was the "aggressor," the plaintiff writes: "[t]he [d]efendants only address the one incident that was later reversed and does [sic] not address any of the other adverse employment actions." (Doc. 33 at 24).  This is slightly more helpful.  The plaintiff's termination was "reversed" in that it was later changed to only a suspension.  The termination and suspension came after the plaintiff complained to Fagan about Schillaci touching her breast.  Thus, the court assumes that the alleged retaliatory act to which the defendants and the plaintiff are referring is the termination and suspension for the complaint to Fagan about Schillaci touching her breast.[20]

---

[19]The retaliation count in the complaint states that "the [d]efendants retaliated against the [p]laintiff for the [p]laintiff's act of objecting to and reporting acts of sexual harassment."  (Doc. 1 at ¶58).  The next paragraph also refers to "the [p]laintiff's complaints," but gives no further information as to which complaints she refers.

[20]Importantly, the defendants <u>only</u> attack this one act of retaliation.  This is key because the plaintiff, in her response brief, alleges the following additional acts of retaliation:

The defendants only argue that the evidence shows that the plaintiff was the alleged "aggressor."  The "facts" sections of the parties' briefs include no statement about the plaintiff being an "aggressor" in any situation, except the one occasion, discussed in Stancil's affidavit, where the plaintiff "shoved" Schillaci.  (Doc. 31 at 9).  There is no evidence that this was the same occasion where Schillaci touched her breast.  Furthermore, it does not matter if the underlying conduct was not

| Alleged Protected Action | Alleged Retaliation |
|---|---|
| "repeated[] complaints to her supervisors about the conduct of the men at the City of Birmingham since 1992" (doc. 33 at 23) | "she was labeled a troublemaker" (doc. 33 at 23) |
| complaints "about the behavior of Tate and Foy to her supervisor" (doc. 33 at 23) | "she was transferred to ride on the truck, a position that removed her disability accommodation and subjected her to further embarrassment about having to go to the bathroom" (doc. 33 at 23) |
| complaints "about having to go to the bathroom frequently" (doc. 33 at 23) | "they began to radio it in when others were not required to radio in when they had to go to the bathroom" (doc. 33 at 23) |
| complaints "about Schillaci's conduct" (doc. 33 at 23) | "the City placed her in a landfill which further removed her from her disability accommodation and resulted in her accidentally soiling herself, and subjected to additional gender-based comments from John Greene" (doc. 33 at 24) |

By setting out the additional alleged retaliation claims, the court renders no opinion on the merits of these claims.  The court merely notes that none of these were attacked (or mentioned) in any way in the defendants' initial brief.  This confusion could have been avoided by the defendants asking the plaintiff at her deposition to set out all alleged acts of retaliation.  If that was done, the citation to that question and its answer were not provided to the court.  Regardless, as retaliation claims based upon these acts were not attacked, they survive the motion for summary judgment.

35

discrimination.   The Eleventh Circuit has held "that a plaintiff may engage in a protected activity for purposes of a Title VII retaliation case, *even if* the underlying grievances are not actually cognizable as discrimination under the law, so long as the complaining party has a 'good faith, reasonable belief' that the employer has engaged in unlawful conduct."   *Gary v. Hale*, 212 F. App'x 952, 956 n. 1 (11th Cir. 2007) (emphasis added) (citations omitted).   The defendants have cited no facts, nor made any argument, that the plaintiff could not have had a good faith belief that touching her breast was unlawful.   Further, to support this statement, in both the initial and reply briefs, the defendants ask the court to consider portions of affidavits not cited in the defendants' statement of facts.   (Doc. 31 at 17) (asking the court to "[s]ee all attached affidavits").   As noted above, the court will not consider this evidence, or these additional facts.

The defendants are left with only the single conclusory statement that "[t]he plaintiff in the present case was not subject to retaliation by the [d]efendants at any point in time." (Doc. 31 at 17).   Unlike the harassment claim, the defendants have not stated that the plaintiff can provide no evidence of retaliation.   Even if the court construed this statement to be such an argument, the court is under no burden to go through the entire retaliation analysis to determine <u>if</u> there <u>might</u> be some problem

36

with the plaintiff's case.[21]

The court should note that, in their reply brief, the defendants argue: "Except for the suspension of her employment, the actions of City did not constitute materially adverse actions. Moreover, she failed to show that those actions were causally related to her protected activity." (Doc. 35 at 5-6). They also discuss the issue of "pretext." (Doc. 35 at 6-7). These are new arguments, not raised in the initial brief in support of the defendants' motion.

"As a general proposition, and in the interests of fairness to all parties and efficient use of judicial resources, new arguments raised for the first time in a reply brief are not considered." *Whitney Bank v. Point Clear Dev., LLC*, CIV.A. 11-0657-WS-M, 2012 WL 2277597 at *8 (S.D. Ala. June 18, 2012) (citing *Herring v. Secretary, Dep't of Corrections*, 397 F.3d 1338, 1342 (11th Cir.2005) ("As we repeatedly have admonished, arguments raised for the first time in a reply brief are not properly before a reviewing court.")). The court will not consider these arguments. The retaliation claims survive.

## C.   <u>Assault and Battery</u>

This claim is brought only against Schillaci and Foy. (Doc. 1 at 10-11).

---

[21] "There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).

However, the inclusion of the respondeat superior count in the complaint makes it apply to the City of Birmingham as well. The count thus will be analyzed as to all defendants.

> The Alabama Supreme Court has stated:
>
> "Assault" has been defined as "an *intentional,* unlawful, offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented." *Western Union Tel. Co. v. Hill,* 25 Ala.App. 540, 542, 150 So. 709, 710 (1933) (emphasis added). *See also Wright v. Wright,* 654 So.2d 542, 544 (Ala.1995). In a civil case, the elements of battery are: (1) that the defendant touched the plaintiff; (2) that the defendant *intended* to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner. *Ex parte Atmore Cmty. Hosp.,* 719 So.2d 1190 (Ala.1998) (emphasis added). Our Supreme Court has explained that " '[a] battery consists in an injury actually *done to the person of another in an angry or revengeful* or rude or insolent manner, as by spitting in the face, or in any way touching him in anger, or violently jostling him out of the way, or in doing any *intentional violence* to the person of another.' " *Surrency v. Harbison,* 489 So.2d 1097, 1104 (Ala.1986) (quoting *Singer Mach. Co. v. Methvin,* 184 Ala. 554, 561, 63 So. 997, 1000 (1913) (emphasis added)).

*Wood v. Cowart Enterprises, Inc.*, 809 So. 2d 835, 837 (Ala. Civ. App. 2001).

The plaintiff bases this claim upon Schillaci touching her breast. (Doc. 1 at 10). It is also based upon Foy's "threaten[ing]" the plaintiff and "ma[king] loud statement in the presence of the [p]laintiff that [the plaintiff] needed to be killed." (Doc. 1 at 11). The only such statements which have been cited to the court are Foy's

statement, referring to the plaintiff, that she "ought to kill her ass," and that Foy "will have someone knock her off after work because she is nothing but trouble." (Doc. 33 at 9-10).

In discussing this claim in their initial brief, the defendants again do not address these acts specifically. <u>They discuss no facts at all</u>. They first cite to the elements of assault and battery and then state, without discussion of specifics: "[a]ssuming arguendo that [p]laintiff was assaulted by an employee of the City; such conduct was clearly not in the line and scope of employment or in furtherance of the business of the City[.]" (Doc. 31 at 17) (citations omitted). Without more explanation and facts, the court cannot say that the defendants have shown the absence of a genuine issue of material fact on that issue.

In the next sentence the defendants write:

The Plaintiff was never the victim of discrimination or abuse at the hands of the Defendants at or during any period of her employment, but rather attempted to provoke and incited confrontations with her co-employees and supervisors (Affidavit of Leory Cowan and Valarie Stancil). Plaintiff herself testified that she used physical force against her co-employee witnessed by another employee. (Deposition of Tingle Shirley, p. 64). Plaintiff's co-employees have witnessed that during her altercations with other employees; she used physical force and was the aggressor. (Affidavit of Valerie Stancil, Affidavit of Katherine Jackson, Jermaine East, Affidavit of Joseph Lightfoot, Affidavit of Fred Williams).

(Doc. 31 at 18). Again, except for the one incident where Tingles "shoved" Schillaci,

these facts were not set out in the defendants' initial statement of facts. They will not be considered. Even they were considered, the defendants do not explain how any of these facts, or the evidence cited, is relevant to Schillaci's or Foy's alleged actions towards the plaintiff.

In their reply brief the defendants argue, for the first time that "[t]here is no evidence . . . that the alleged touching of the [p]laintiff by Frank Schillaci was conducted with any offensive sexual overtones." (Doc. 35 at 9). They again cite evidence not presented in the initial facts. Again, as this argument was first raised in the reply brief, and the new facts and evidence were not included in the initial statement of facts, the court will not consider this argument.[22]

Summary judgment will be denied on the assault and battery claims.

**D.    Outrage**

As this count is brought against the "[d]efendants" (see doc. 1 at 11), the court treats it as if it is alleged as to all defendants.

The defendants correctly argue that the outrage claims are due to be dismissed. The Alabama Supreme Court has generally instructed that claims of outrage are

---

[22]To the extent that the defendants argue Schillaci's intentionally touching a woman's breast is not sexual, the court finds such a contention to be ludicrous, particularly given his other conduct. Further, for assault and battery, the touching need not be sexual, only "harmful or offensive." *Ex parte Atmore Community Hosp.*, 719 So.2d 1190, 1194 (Ala.1998).

supported by allegations that

> one who by conduct so outrageous in character, and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society, intentionally or recklessly causes another person emotional distress so severe that no reasonable person could be expected to endure it [.]

*Nat'l Sec. Fire & Cas. Co. v. Bowen*, 447 So.2d 133, 141 (Ala. 1983).  The tort "is a very limited cause of action that is available only in the most egregious circumstances."  *Thomas v. BSE Indus. Contractors, Inc.*,  624 So.2d 1041, 1044 (Ala. 1993).  Alabama has recognized the tort of outrage in cases dealing with egregious sexual harassment.  *See, Busby v. Truswal Sys. Corp.*, 551 So.2d 322 (Ala. 1989).  The conduct at issue in this case is akin to that in *Busby*.

Summary judgment will be denied on the outrage claim.

### E.    **Negligent Hiring, Training, and Supervision**

#### 1.    *Only the City of Birmingham Is a Proper Defendant for this Count*

Similar to respondeat superior, this count allows a master to be held liable for his servant's actions.  *Big B, Inc. v. Cottingham*, 634 So. 2d 999, 1002-03 (Ala. 1993).  In this case, only the City of Birmingham is alleged to be in the position of "master."  Only it is a proper defendant as to this claim.  This count will be dismissed to the extent that it is asserted as to the individual defendants.

## 2.    *The Basics of the Tort in Alabama*

In *Big B*, the Alabama Supreme court issued an opinion which is generally regarded as creating, or at least reaffirming, in the state, the tort of negligent training, hiring, and supervision.[23]   The court wrote:

> In the master and servant relationship, the master is held responsible for his servant's incompetency when notice or knowledge, either actual or presumed, of such unfitness has been brought to him. Liability depends upon its being established by affirmative proof that such incompetency was actually known by the master or that, had he exercised due and proper diligence, he would have learned that which would charge him in the law with such knowledge. It is incumbent on the party charging negligence to show it by proper evidence. This may be done by showing specific acts of incompetency and bringing them home to the knowledge of the master, or by showing them to be of such nature, character, and frequency that the master, in the exercise of due care, must have had them brought to his notice. While such specific acts of alleged incompetency cannot be shown to prove that the servant was negligent in doing or omitting to do the act complained of, it is proper, when repeated acts of carelessness and incompetency of a certain character are shown on the part of the servant to leave it to the jury whether they would have come to his knowledge, had he exercised ordinary care.

*Big B*, 634 So. 2d at 1002-03.

---

[23]This tort is sometimes called "negligent and/or wanton hiring and supervision," *Voyager Ins. Companies v. Whitson*, 867 So. 2d 1065, 1073 (Ala. 2003), and  "negligent hiring, retention, and supervision" *Jones Exp., Inc. v. Jackson*, 86 So. 3d 298, 304 (Ala. 2010).  All of these versions are the same tort for purposes of the analysis that appears in this section.

### 3.    *The Claim Survives*

The defendants argue that, even if the plaintiff were to prove sexual harassment, she still would not have a claim for negligent hiring, training and supervision because "the Alabama Supreme Court has held that a plaintiff is required to prove an underlying <u>Alabama common-law tort</u> in order to prevail in a claim for negligent supervision, training or retention."  (Doc. 31 at 19-20) (emphasis added). They continue that, since Alabama recognizes no claim for sexual harassment at common law,[24] the negligent hiring, training, and supervision claims must fail.

However, the court finds that plaintiff's claims of assault and battery and of outrage survive summary judgment.[25] Accordingly, the defendant's argument fails on its face.[26]  The negligent hiring, training, and supervision claims will survive.[27]

---

[24]"It is well settled that Alabama does not recognize an independent cause of action for sexual harassment. Instead, claims of sexual harassment are maintained under common-law tort theories such as assault and battery, invasion of privacy, negligent training and supervision, and outrage."  *Stevenson*, 762 So. 2d at 827, n. 6.

[25]*See supra*, sections III. C. and III. D.

[26]Further, in *Ex parte Transp. Leasing Corp.*, 1120326, 2013 WL 1858774 at *4 (Ala. May 3, 2013), the Alabama Supreme Court's most recent opinion on the issue, the court was clear that "implicit in the tort of negligent hiring, retention, training, and supervision is the concept that, as a consequence of the employee's incompetence, the employee committed some sort of act, wrongdoing, or tort that caused the plaintiff's injury."  *Ex parte Transp. Leasing Corp.*, 2013 WL 1858774 at * 4.  The language "some sort of act, wrongdoing, or tort," is very inclusive.  Certainly, federally prohibited sexual harassment falls within such a wide net.

[27]The court will not consider the defendants' argument, raised for the first time in their reply brief, that the plaintiff "has not identified the underlying tort claim upon which she relies to establish her negligent supervision claim."  (Doc. 35 at 9).

F.     **Respondeat Superior**

In their initial brief, the defendants only attack their liability for respondeat superior as it concerns the "employment discrimination" claims, without specifying which of those claims (the tangible employment action, hostile work environment, or retaliation claims) they attack. (Doc. 31 at 21). They also are not clear as to the reason respondeat superior is inappropriate as to whichever claims they are attacking.

The defendants cite *Chambers v. Amick*, No. CIV.A. 86-AR-5588-NW, 1987 WL 47726 (N.D. Ala. June 15, 1987), for the proposition that "[i]n order to recover against a defendant on the theory of respondeat superior, it is necessary for the plaintiff to establish the status of master and servant and that the act was within the line and scope of the servant's duties of employment." (Doc. 31 at 21). Of course this language, lifted directly from the *Chambers* opinion at page *8 and presented as if it were the defendants' own, discusses only the <u>state law</u> theory of respondeat superior. *Chambers*, 1987 WL 47726 at *8 (quoting *Naber v. McCrory & Sumwalt Construction Co.,* 393 So.2d 973 (Ala.1981)). Here, the defendants allege the failure of respondeat superior as to the discrimination claims, which are brought pursuant to <u>federal</u> law.

The distinction is important, because respondeat superior is essentially "built in" to Title VII. For example, to prove a hostile work environment claim, the

plaintiff must show

> (1) that she belongs to a protected group; (2) that she has been subject to unwelcome sexual harassment; (3) that the harassment was based on her sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment; and (5) that there is a basis for holding the employer liable.

*Bryant*, 142 F. App'x at 383 (emphasis added).  The defendants do not cite any of the elements of the plaintiff's discrimination claims, nor discuss the correct standard to apply to them.

After erroneously citing to the state law of respondeat superior, the defendants then incorrectly assert that "the [p]laintiff has never made any complaint, verbal or written that her co-employee ever touched her or sexually harassed her."  (Doc. 31 at 21).  As shown in the preceding sections, the defendants have admitted, for purposes of this motion, that complaints were made.  The defendants also confusingly argue that "[i]t is undisputed that [no one has] ever made racially derogatory remarks to the [p]laintiff."  (Doc. 31 at 21).  That is understandable in light of the fact that the plaintiff claims only sex, not race, discrimination.

The defendants next write: "The Plaintiff has presented only evidence of discriminatory remarks by her co-workers.  Plaintiff cannot provide a date for her altercations."  (Doc. 31 at 21).  Again, the first sentence is incorrect.  The second sentence is not specific as to what "altercations" the defendants refer.

Finally, in their initial brief, the defendants write:

> In an employment discrimination case, the plaintiff bears the ultimate burden of proving that the defendant intentionally discriminated against the plaintiff[.]
>
> . . .
>
> Seen in the light most favorable to the Plaintiff, these alleged remarks are insufficient to establish an inference of discriminatory intent. First, by plaintiff's own admission, they appear to be stray and remote in time from the disciplinary action taken by the Defendant. Second, and most important, no remark was made by an individual who had any influence on the decision to terminate the plaintiff. In short, plaintiff has not shown any causal connection between these remarks and her termination. Therefore, plaintiff's claim under respondeat superior does not stand in this case.

(Doc. 31 at 21).  This paragraph seems to argue parts of the *McDonnell-Douglas*

analysis, which, as shown above, is not applicable to the sexual harassment claims.

Regardless, the court does not see what the statements in this paragraph have to do

with respondeat superior.

In their reply brief, the defendants discuss hostile work environment

specifically, cite to new law, and set out new arguments.  (Doc. 35 at 11-13).  Again,

however, because these arguments were presented for the first time in the reply brief,

it would be unfair to the plaintiff to entertain them now, and the court will not do so.

### G.   Claims Under 42 U.S.C. § 1983

The defendants' only argument here is that "[a]ny decision on the part of the

City which resulted in an adverse employment actions [sic] more than an inconvenience [sic] were not due to or as a result of plaintiff's protected activities, but were based upon lawful, legitimate business reasons." (Doc. 31 at 22). This sounds more like a retaliation defense than a section 1983 defense. They then immediately cite *Pennington v. City of Huntsville*, 261 F.3d 1262 (11th Cir. 2001), without giving a pinpoint citation or explaining for what proposition it is cited. Thereafter, the defendants, again, cite to facts and argument not included in the "facts" section of their initial brief. They cite <u>no</u> law explaining claims under 42 U.S.C. § 1983. None of the new facts and evidence will considered. This argument, devoid as it is of facts, law, and coherent argument, fails.

### H.   <u>The ADA Claim</u>

This count only applies to the plaintiff's "employer," the City of Birmingham. (Doc. 1 at 14). The Eleventh Circuit has noted that

> The ADA prohibits discrimination against a "qualified individual" with a disability with respect to any term, condition or privilege of employment. 42 U.S.C. § 12112(a) and *D'Angelo v. ConAgra Foods, Inc.,* 422 F.3d 1220, 1227 (11th Cir.2005) (discussing the purpose of the ADA). Under the ADA, discrimination includes the failure to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual. 42 U.S.C. § 12112(b)(5)(A) and *Lucas v. W.W. Grainger, Inc.,* 257 F.3d 1249, 1255 (11th Cir.2001) (addressing an ADA accommodation claim).

*E.E.O.C. v. Eckerd Corp.*, 1:10-CV-2816-JEC, 2012 WL 2726766 at *4 (N.D. Ga.

July 9, 2012).  The defendants state, without citation to the record:

> In the present case, the [d]efendant has never stopped [p]laintiff from
> doing any desired work and offered overtime.  Moreover, defendant has
> accommodated every genuine request of the Plaintiff at all times and
> therefore, was never in violation of ADA.

(Doc. 31 at 23).  The defendants do not explain what the first sentence has to do with

ADA cases.  As to the second, it is undisputed that the plaintiff provided proof of her

medical condition, irritable bowel syndrome, to the City.  (Doc. 33 at 7).  The City

initially granted accommodations to the plaintiff, but later took them away when she

was transferred.  (Doc. 33 at 8, 10).

Again, new arguments are set out in the reply brief, but they will not be

considered by the court.

I.    **Qualified Immunity**

The defendants cite the law of qualified immunity, but do not argue why it

should apply to them.    (Doc. 31 at 23-24).  "The defense of qualified immunity

completely protects government officials performing discretionary functions from suit

in their individual capacities unless their conduct violates clearly established statutory

or constitutional rights of which a reasonable person would have known." *Cottone*

*v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003) (internal quotation marks and citations

omitted).[28]  "To receive qualified immunity, a government official first must prove that he was acting within his discretionary authority."  *Id*. at 1357-58.

The defendants having failed to satisfy this initial burden, summary judgment is not appropriate on the issue of qualified immunity.

### J.   Punitive Damages Claims Against the City of Birmingham

The defendants argue that "[p]unitive damages are never recoverable against a municipality under Alabama law for state and federal claims." (Doc. 31 at 24).  The plaintiff concedes that she cannot receive a punitive damage award from the City. (Doc. 33 at 34).  Summary judgment is appropriate on that claim.[29]

## IV.   CONCLUSION

Based on the foregoing the motion for summary judgment is **GRANTED** as to: (1) the Title VII sexual harassment and retaliation claims against the individual defendants; (2) the negligent hiring, training, and supervision claims against the individual defendants; and (3) the claims for punitive damages against the City of

---

[28]Under Alabama law, a granting of qualified immunity, when properly analyzed under Eleventh Circuit precedent, to a defendant as to a plaintiff's claims pursuant to 42 U.S.C.A. § 1983 *per se* entitles the defendant to qualified immunity from all state-law based claims asserted against that same defendant.  *See Lightfoot v. Floyd*, 667 So.2d 56, 63-64 (Ala. 1995).

[29]The plaintiff argues that she can receive punitive damages from the individual defendants to the extent that they are sued in their individual capacities.  (Doc. 33 at 34-35).  The defendants have not moved for summary judgment on that issue, so the court declines to address it.

Birmingham.   Those claims are **DISMISSED, with prejudice**.   The motion is

**DENIED** in all other respects.

      **DONE** and **ORDERED** this 18th day of September, 2013.

                                        _____

                                       **VIRGINIA EMERSON HOPKINS**
                                       United States District Judge